UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| RICHARD DAVID SIMMONS, | : | **LEAD CASE**<br>Civ. Action No.<br>04-0572(NLH) |
| Plaintiff, | : | |
| v. | : | CONSOLIDATED CASES<br>Civil Action Nos.<br>05-5080 and 06-0445 |
| FRANK TIMEK, CHARLES MILLER,<br>CITY OF ATLANTIC CITY, and<br>MAYOR LORENZO LANGFORD, | : | **OPINION** |
| Defendants. | : | |

**APPEARANCES:**

Richard David Simmons
110 I.S. Cole Plaza
Atlantic City, NJ 08401
*Pro Se Plaintiff*

A. Michael Barker,  Esquire
Barker, Scott & Gelfand, PC
Linwood Greene
210 New Road
Suite 12
Linwood, NJ 08221
*Attorney for Defendants Officers Frank Timek and Charles Miller*

John Charles Hegarty, Esquire
Solicitors Office for Atlantic City
City Hall, 1301 Bacharach Boulevard
Atlantic City, NJ 08401-3603
*Attorney for Defendant City of Atlantic City and Mayor Langford*

**HILLMAN**, District Judge

This matter has come before the Court on Defendants' motions for summary judgment, and Plaintiff's cross-motion for summary judgment.  For the reasons expressed below, Defendants' motions will be granted, and Plaintiff's motion will be denied.  Also

pending before the Court are six discovery motions and a separate motion to dismiss all filed by Plaintiff.  They will be addressed below as well.

I.   **BACKGROUND**

Pursuant to 42 U.S.C. § 1983, plaintiff, Richard Simmons, *pro se*, filed several separate lawsuits, which have since been consolidated, concerning two arrests that occurred on October 28, 2003 and January 21, 2004 in Atlantic City, New Jersey.  Simmons claims that on both occasions, the defendant police officers used excessive force in effecting his arrest, and they falsely arrested him.  Simmons also claims that the City of Atlantic City and Mayor Langford failed to properly train the police officers, and they failed to enforce a strict policy against excessive force.

As a result of the *pro se* prisoner complaint screening process, which is conducted pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A, Simmons' false arrest claims were dismissed without prejudice.[1]  Following a long and motion-filled discovery process on his remaining claims, all defendants have now moved for summary judgment in their favor.  Simmons has stated that he

_____

[1]Simmons was incarcerated at the time he filed his complaints.  His false arrest claims, which also included assertions of racial profiling, were dismissed because his criminal charges were pending at the time he submitted his complaints.  (See Docket No. 2.)  He has not moved to amend his complaints to reassert these claims.

does not oppose their motions, but he has filed his own cross-motion for summary judgment.

**II.** **DISCUSSION**

    **A.** **Jurisdiction**

This Court's jurisdiction is pursuant to 28 U.S.C. § 1331.

    **B.** **Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir.

2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

### C.  Analysis

#### 1.  *The two incidents*

Simmons' claims revolve around two arrests that occurred a few months apart.  The first arrest took place on October 28, 2003.  According to Officer Timek's police report, on that day, Timek observed Simmons, who Timek knew from previous unrelated

4

CDS investigations, walking in the high crime area of Belfield and New York Avenues in Atlantic City.  After observing Simmons, Timek discovered that Simmons had an active warrant, and he notified dispatch that he and Officer Dodson, who is not a defendant in this action, would be stopping Simmons.  Timek pulled along side Simmons, who started screaming obscenities at the officers and stating that the police were harassing him for no reason.  After Timek stopped and got out of his vehicle, Timek informed Simmons of his outstanding warrant, and asked him to put his hands on his head because Timek was placing him under arrest. Timek performed a protective pat down and found a open bottle of alcohol in Simmons' back pocket.  As Timek retrieved the bottle, Timek reports that he felt Simmons' muscles flex in an attempt to turn his body around to face Timek.  As Simmons turned, Simmons shouted obscenities and swung his elbows in the air in an attempt to strike Timek.  Timek attempted to hold onto Simmons by his coat, but he could not hold on.  Officer Dodson helped Timek bring Simmons to the ground.

While on the ground, Timek reports that Simmons began to violently resist the officers' control by twisting and turning his arms and body.  Timek and Dodson told him numerous times to stop resisting, but Simmons did not comply.  Timek reports that it was difficult to maintain a grip on Simmons because of his strength combined with Simmons being slippery with rain and

sweat.  While he was resisting, Simmons continued to shout, "Get the f--- off me," and Timek reports that at one point, Simmons struck him in the facial area with a closed fist.  Timek also reports that Simmons tried to spit on the officers.  Further, Timek reports that at one point, Simmons "took hold of Officer Dodson's shirt (by his neck area) and began pulling him down towards him.  I attempted to deliver several knee strikes to the suspect's thigh area but am not sure how much contact I made due to the suspect's movement (resisting)."  During this incident, Timek informed dispatch two times that Simmons was resisting arrest.  Eventually, the K-9 officer arrived on the scene with back up units, and Timek reports that Simmons began to comply once he heard the police dog.  Timek then handcuffed Simmons.

Dodson transported Simmons to the station, and Timek observed Simmons hit the divider and the windows.  Once at the station, Timek reports that Simmons stated that if he was let go, he would "snitch" on someone who had narcotics in his possession.  Simmons also stated that if he was not let go, he would go to Internal Affairs and tell them that the police "f---ed him up for no reason."  Officer Dodson's police report relates the same events.

Simmons was charged with resisting arrest, aggravated assault, and contempt of court.  On February 16, 2005, Simmons pleaded guilty to resisting arrest, and sentenced to 60 days in

6

prison.

Although not included in his original complaint, in his motion for summary judgment, Simmons sets forth a different version of events for his October 28, 2003 arrest. Simmons states that two marked police cars with their lights off followed him down an alley. Simmons claims that Timek jumped out of the vehicle and slammed him across the vehicle and told two other individuals to leave the area. Once the two people left, Simmons claims that Timek punched him on the side of the face, knocking him to the ground. While he was on the ground, Simmons states that Timek and Dodson kicked and punched him in the face, head, and body. Simmons relates that he grabbed the boots and fists of both officers to prevent further injury. Simmons states that he was knocked unconscious, and when he regained his consciousness, he was being lifted into the back of the patrol car. Simmons states that he vigorously requested medical treatment, but it was denied. Simmons also states that the transcripts of the dispatch communications tapes will show that Timek did not call two times for assistance. Simmons states that his injuries included a black eye and multiple abrasions on his face.

The second incident at issue here occurred on January 21, 2004. According to the police report of Officer Stites, who is not a defendant in this action, dispatch received a call reporting that a man had been assaulted by a group of males on

Pacific Avenue.  While on route to the scene, a female, who was
standing next to an elderly male, flagged down Stites to report
that the man next to her, who is legally blind, had been attacked
and robbed by a black male.  The female stated that she observed
the black man throw the elderly man to the ground, put his knee
on his back, and go through his pockets, stealing forty-two
dollars.  The female witness described the black man as wearing a
silver colored jacket, and indicated that he had run away from
the area.  An unidentified person in a vehicle pulled up to the
officer and informed him that a group of males with guns had run
into Hermans Bar, which is located on New York Avenue around the
corner from Pacific Avenue.  Officer Stites reported this
information to dispatch, and proceeded to Hermans Bar.

    While Stites was on route to Hermans, Officers Timek and
Miller had arrived on the scene and entered the bar.  According
to the officers' police reports, they saw a black male wearing a
black jacket with a silver colored hooded sweatshirt underneath
standing by the door.  Timek identified the man as Simmons, and
both he and Miller noted that Simmons looked nervous and began to
back away.  Timek observed Simmons drop several items from his
left hand, and upon closer examination, Timek identified the
items as U.S. currency.  Timek also reports that he observed
Simmons reach deeply into his front right pants pocket with his
right hand, and fearing that Simmons might have a weapon, Timek

8

took hold of Simmons right hand and ordered him to release it.
At this point, Simmons began to physically resist Timek's control
by flailing his arms with closed fists and shouting profanities.
Timek then placed Simmons in a compliance hold and escorted
Simmons outside the bar.

Stites arrived on the scene when Timek was coming out of the
bar with Simmons.  He reports that he saw Simmons physically
resisting Timek.  The female witness, who had also arrived
outside the bar when Simmons was being escorted out by Timek,
identified Simmons as the elderly man's attacker.  Stites
approached Timek, who was standing with Simmons and several other
officers, and advised that the female witness had identified
Simmons as the attacker.  Stites reports that when officers
attempted to handcuff Simmons, he resisted the officers.  Timek
also reports that as he attempted to handcuff Simmons, Simmons
continued to physically resist.  After several verbal commands,
Simmons still did not comply.  Timek reports that as he was about
to lose his grip on Simmons, he managed to bring him to the
ground, and with Stites' assistance, handcuffed Simmons.  Timek
found $7.00 in Simmons' right front pants pocket.

Stites then spoke again to the female witness and the
elderly victim.  The female witness again confirmed that it was
Simmons who had robbed the man, and the elderly man realized that
he still had some money in his pocket, and that only $12.00 had

9

been stolen.  Stites transported them to the station for statements.

At the same time, an ambulance had arrived to treat Simmons for an injury to his mouth area.  Timek reports that because Simmons began spitting blood at the officers on the scene, was shouting, and was attempting to get up off the ground, Timek chose to transport Simmons to the Atlantic City Medical Center for treatment.  Once there, Timek reports that Simmons spit blood at him and Miller, who had responded to the medical center to assist Timek.  A spit mask was placed on Simmons by the medical staff, but Simmons continued to struggle and act "unruly." Simmons was placed on a stretcher, and he still continued to scream obscenities at the officers and hospital staff.  At one point, Simmons attempted to get off the stretcher, and when Miller attempted to place him back on the stretcher, Simmons kicked Miller with both feet in the left rib area and on the left hand.

Once Simmons was cleared by the medical staff to go to jail, Timek transported Simmons in his police car, with Miller following behind.  During the transport, Timek reports that Simmons threatened Timek, and began to kick at the windows and interior of the patrol car with his feet.  Miller witnessed this behavior from his patrol vehicle.  Timek and Miller pulled over their vehicles, and Timek exited the car, and opened the back

10

seat door to inform Simmons that he was going to administer
pepper spray if Simmons did not stop kicking at the windows.
Both Timek and Miller report that Simmons began to kick at Timek,
at which point Timek sprayed Simmons in the face with one short
burst of pepper spray.  Simmons stopped kicking, Timek closed the
patrol door, and they continued the transport to the Public
Safety Building.

Once they arrived, Simmons was provided with free flowing
water to clean himself of the pepper spray.  When Simmons was
asked if he needed further medical treatment, Simmons stated, "F-
-- you Timek."  Timek recovered $7.00 from Simmons, which was
placed in the property and evidence room.  It was discovered that
Simmons had an active warrant.  He was charged with robbery,
aggravated assault on police, resisting arrest, and terroristic
threats.

Simmons admits that he was in Hermans Bar on January 21,
2004, but he denies that he robbed the elderly blind man.  He
states that Timek entered the bar alone, and dragged him outside,
where Miller was waiting, and they both began to kick and punch
him throughout his face, head and body.  Simmons relates that he
was knocked unconscious.  Simmons reports that at the hospital,
Miller and Timek choked and smacked him while he was on the
stretcher, and states that the spit mask was placed on his face
to hide his injuries.  Simmons contests that an ambulance was

11

dispatched to the scene at Hermans Bar, and he questions that if he was acting so violently at the scene, why pepper spray was not used at that point.  Simmons also contests Timek's report that he saw Simmons run into Hermans Bar.

Simmons brought criminal charges against Timek and Miller for this incident.  Simmons alleged that the officers choked, punched, and kicked him throughout his head and body, causing a black eye, split lip, and multiple abrasions to his face.  Simmons dismissed these charges, he was indicted for robbery, and pleaded guilty to robbery.

### 2. *Simmons' claims*

In his complaints, Simmons claims that for both incidents, he was falsely arrested, and the officers used excessive force in effecting his arrests.  He also claims that the City of Atlantic City and the Mayor failed to properly train the officers not to use excessive force, and that they failed to enforce a policy against excessive force.

As an initial matter, as noted above, Simmons' claims for false arrest were dismissed without prejudice by the Court at the inception of these suits through the *pro se* prisoner litigation screening process.  Simmons has never moved to amend his complaints to reassert his false arrest claims.  Consequently, because claims for false arrest are not part of his lawsuit, the

Court cannot consider them.[2]

Additionally, Simmons originally asserted his excessive force claim for the October 28, 2003 incident against Timek and Miller.  Simmons has since withdrawn this claim against Miller, because he acknowledged that Miller was not present during that incident.  (See Docket No. 68.)  Thus, Simmons' excessive force claim for the October incident is solely against Timek, with his excessive force claim for the January incident remaining against both Timek and Miller.

> **a.   Excessive force claims**[3]

The qualified immunity analysis provides the basis to

---

[2]Even if Simmons' false arrest claims were active, or if Simmons sought to have them reinstated, they would be barred under the Heck doctrine.  In Heck, the Supreme Court held that "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" is not cognizable under 42 U.S.C. § 1983, unless the conviction or sentence was "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  Heck v. Humphrey, 512 U.S. 477, 486-87 (1994).  Simmons has not provided any evidence that his convictions and sentences for resisting arrest and robbery, crimes for which he now claims he was false arrested, were ever reversed, expunged or declared invalid by any court or adjudicative body.  Thus, Simmons cannot bring a claim under § 1983 for being falsely arrested for resisting arrest and robbery because a finding in his favor would render those convictions invalid.

[3]The primary focus of Simmons' motion for summary judgment and other submissions, is not in regard to this excessive force claims, but rather is an attempt to poke holes in the evidence that lead to his two arrests.  The Court construes this as an argument that the police lacked probable cause to arrest him. This argument cannot be considered, however, because, as noted above, Simmons has no pending claims challenging the validity of his arrests.

determine whether a claim for a constitutional violation by a law enforcement officer is viable.  The standard promulgated by the Third Circuit is as follows:

> Qualified immunity protects law enforcement officers from being tried for actions taken in the course of their duties.  If the immunity applies, it entitles the officer to be free of the 'burdens of litigation.' But the immunity is forfeited if an officer's conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' To determine ... whether the officers have lost their immunity, we must engage in a two step analysis. First, we must decide 'whether a constitutional right would have been violated on the facts alleged . . . .' ... Second, if we believe that a constitutional violation did occur, we must consider whether the right was "clearly established."  The question is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' This is an objective inquiry, to be decided by the court as a matter of law.

Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004) (citations omitted).  Thus, in order to determine whether Simmons' claims against the officers are viable, it must first be determined whether the officers violated Simmons' constitutional rights.

Simmons claims that the officers used excessive force on him while effecting his arrests.  In determining whether excessive force was used during an arrest, the Fourth Amendment's "objective reasonableness" test is applied.  Sharrar v. Felsing, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).  The objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at

14

issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> (relying on <u>Graham</u>, 490 U.S. at 396; <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634 (3d Cir. 1995)).  In evaluating the proper test for objective reasonableness, the Supreme Court has provided that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)(citation omitted).  Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving-- about the amount of force that is necessary in a particular situation." <u>Id.</u>

Here, Simmons has not provided any evidence to refute that the officers were objectively reasonable in using force in effecting his two arrests.[4]

### 1. *October 28, 2003 arrest*

With regard to the October 28, 2003 arrest of Simmons for an outstanding warrant, Timek argues that his use of force was not

---

[4]Because Simmons has filed a cross-motion for summary judgment, he not only has the burden to identify specific facts and affirmative evidence that contradict those offered by the defendants, he has an independent burden of demonstrating the absence of a genuine issue of material fact as to his claims. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

excessive, and he denies Simmons' version of events.  Concerning
the amount of force used to effect Simmons' arrest, Timek
reports, and fellow officer Dodson corroborates, that because
Simmons was yelling obscenities and swinging his elbows in the
air in an attempt to strike Timek, Timek was required to bring
Simmons to the ground in order to control him.  Then, because
Simmons (1) continued to violently resist the officers' control
by twisting and turning, (2) did not heed numerous commands to
stop resisting, (3) continued to shout obscenities, (4) struck
Timek with his fist, (5) attempted to spit on the officers, and
(6) took hold of Dodon's shirt and tried to pull him down, Timek
attempted to deliver several knee strikes to Simmons' thigh area.
It was not until the K-9 unit arrived that Simmons stopped
resisting and Timek was able to handcuff Simmons.  Thus, in light
of the circumstances described by Timek and Dodson, Timek argues
that the force used in effecting Simmons arrest, which entailed
holding onto his arms, bringing him to the ground, and attempting
several knee strikes to Simmons' thigh area, was reasonable.

Concerning Simmons' version of the events, Timek has
provided Simmons' October 28, 2003 medical intake records to
refute Simmons' claims, as well as pointed out that Simmons
pleaded guilty to resisting arrest as a result of this incident.
Additionally, an internal affairs investigation of a complaint
lodged by Simmons for this incident exonerated Timek of
wrongdoing.

16

In contrast to Timek's position, Simmons first claims that he did not resist arrest.  Second, Simmons argues that for no reason he was kicked and punched in the face and head, to the point where he lost consciousness.  Because of this abuse, Simmons claims that he sustained multiple abrasions to his face and a black eye, and that when he arrived at the Atlantic County Justice Facility, he was "bleeding all over the place."[5]

Simmons has the burden of proof to establish the elements of a Fourth Amendment violation.  See Edwards v. City of Philadelphia, 860 F.2d 568, 573 (3d Cir. 1988).  Further, to withstand a properly supported motion for summary judgment, Simmons must identify specific facts and affirmative evidence that contradict those offered by the defendants, and he must do more than just rest upon mere allegations.  Anderson, 477 U.S. at 256-57.  Other than his allegations, however, Simmons has not provided any evidence to substantiate his claims.

With regard to his claim that he did not resist arrest, as indicated by Timek, Simmons pleaded guilty to the charge of resisting arrest for the October 28, 2003 incident.  When entering his plea, the judge asked Simmons whether he was guilty of resisting arrest by Timek, and Simmons answered "yes."  (Def.

---

[5]Simmons also argues that the police dispatch tapes would demonstrate that Timek did not call dispatch twice for assistance because Simmons was resisting arrest.  A review of the dispatch tapes for the October 28, 2003 arrest provided by the defendants do not reveal any disparity.

Ex. 14.)  The fact that Simmons admitted to resisting arrest is *prima facie* evidence that he did in fact resist arrest.

Further, the medical intake forms provided by Timek contradict Simmmons' claims.  The medical records do not note any injuries Simmons claimed to have suffered.  Indeed, had Simmons been kicked and beat to the point of unconsciousness, and had arrived at the Atlantic County Justice Facility bleeding all over the place, it would not be unreasonable to assume that the medical intake records would reflect such injuries.[6]  See, e.g., Pulice v. Enciso, 39 Fed. Appx. 692, 696 (3d Cir. 2002) (holding that the medical records, which showed only a bruise on the suspect's back and leg and an abrasion on her left hand, did not support the suspect's claim of excessive force for when the police allegedly threw the suspect face down on the ground, and beat her with a hard object); Williams v. Mattek, 2007 WL

---

[6]Simmons testified at his deposition that when he arrived at the county facility, he was seen by a nurse and physician.  (Def. Ex. 5 at 73.)  He stated that the nurse noted down her observations of his bruises, lumps, and blood, and he was given pain medication before being released into the general population.  (Id.)  Simmons has not provided any records to support this testimony.  Later in his deposition, when asked whether he went to the hospital on October 28, 2003, Simmons responded that he refused medical care.  (Id. at 172.)   A few minutes later into his deposition, Simmons stated that he did receive medical care at the county facility.  (Id. at 183.)  He also stated that he asked Timek to go to the hospital while Timek was transporting him to the county facility because he was "bleeding all over the place," but Timek "said nothing."  (Id. at 184-85.)  However, the police reports and records demonstrate that Dodson, not Timek, transported Simmons to the county facility on October 28, 2003.

2363139, *3 (D.N.J. Aug. 15, 2007) ("The medical records for plaintiffs reflect the subjective complaints of injury by plaintiffs, but reveal no injuries actually sustained by plaintiffs as a result of their arrest. The lack of any demonstrable injuries to plaintiffs further demonstrates that the physical force applied by defendants to effectuate their arrests was reasonable.").

The United States Supreme Court has emphasized that each case alleging excessive force must be evaluated under the totality of circumstances. Graham v. Connor, 490 U.S. 386, 396-97 (1989). The evidence shows that the only force used by Timek was placing Simmons on the ground to handcuff him. Under the totality of circumstances, placing Simmons, who was actively resisting arrest, on the ground in order to effect his arrest is not excessive force. See, e.g., Feldman v. Community College of Allegheny, 85 Fed. Appx. 821, 826 (3d Cir. 2004) (citing Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)) (stating that the record clearly showed that the suspect was resisting arrest, and even assuming that the suspect's claim that the officers kicked him in the head is true, holding that when the suspect was taken to the ground "the force resulted as part of the struggle and was not excessive in light of [the suspect's] physical resistance); Pulice, 39 Fed. Appx. at 695-96 (holding that the police were justified in throwing a suspect to the ground and beating her with a hard object because she was

resisting arrest); <u>Tofano v. Reidel</u>, 61 F. Supp. 2d 289, 302
(D.N.J. 1999) (holding it was not excessive force when the
suspect continually kicked and fought the officers as they tried
to hold him on the ground to finish handcuffing him).
Consequently, summary judgment must be entered in favor of Timek
on Simmons' excessive force claim arising out of the October 28,
2003 arrest.

### 2.  *January 21, 2004 arrest*

In his motion for summary judgment, Simmons claims that on
January 21, 2004 Timek waited until the sun set, entered Hermans
Bar alone, dragged him outside, where Miller was waiting, and
they both proceeded to kick and punch him in the head, face and
body, until he was knocked unconscious.  Because of these
injuries, Timek took Simmons to the emergency room, where Simmons
claims that Timek and Miller continued to beat him, and placed a
spit mask on him in order to cover up the injuries.  Then, after
discharge from the hospital and in route to the county facility,
Timek, for no reason, pulled over and sprayed Simmons with pepper
spray.  Simmons contends that these allegations support a finding
of excessive force.

Timek and Miller relate a different version of events.
Timek and Miller both reported that they entered the bar, and
Timek apprehended Simmons, who matched the description of the
person who robbed the elderly man provided by the eyewitnesses.

When Timek exited the bar with Simmons, Simmons was resisting arrest, and because he continued to resist, Simmons was brought to the ground and then handcuffed.  As a result of being brought to the ground, Simmons sustained a cut to his lip.  Because Simmons continued to act violently, Timek transported Simmons to the emergency room for treatment to his lip.  Once at the hospital, Timek and Miller report that Simmons continued to act violently, and that hospital staff placed a surgical mask over Simmons' mouth so that he could not spit blood at the officers of the staff.

Then, after Simmons was cleared for transport to the county facility, during transport in the back of Timek's patrol car, Simmons began to kick the passenger doors and windows.  Miller observed Simmons' behavior from his patrol car, which was following behind Timek's.  Because Simmons would not comply with Timek's orders to stop kicking the doors and windows, which he repeated numerous times while he was driving and after he pulled over, and because Simmons then attempted to kick Timek, Timek administered one blast of pepper spray, which immediately subdued Simmons.  As soon as they arrived at the county facility, Simmons was provided with running water to clean himself of the pepper spray.

The evidence in the record contradicts Simmons' claims, and supports Timek and Miller's version of events.  First, with regard to Simmons' claims that he was kicked and punched outside

21

Hermans Bar to the point where he lost consciousness, Simmons has not provided any evidence to support these claims.  When Timek exited the bar with Simmons, there were numerous people, including the female witness and the victim, as well as several other officers, standing on the street in front of the bar. These people all observed Timek bring Simmons out of the bar and watched as Timek and Officer Stites attempted to handcuff Simmons.  Simmons has not provided any testimony from any of these people, who would have observed Timek and Miller beating and kicking Simmons as he claims, to support his claims. Instead, Timek's and Miller's police reports, Officer Stites' report, and radio dispatch records all corroborate that Simmons was resisting arrest.  These reports also indicate that the only force used by the officers was to bring Simmons to the ground so that he could be handcuffed.

The hospital records also contradict Simmons' claims.  See, e.g., Pulice, 39 Fed. Appx. at 696; Williams, 2007 WL 2363139 at *3.  The records report that Simmons was acting abusively to the police and staff, that he refused treatment, and his only injury was dried blood on his mouth.  The records do not report any of the injuries Simmons claims he sustained as a result of being kicked and punched in the face and body.[7]  No triage

_____

[7]Simmons circles a notation on his emergency room medical records in the medical history section that states "head trauma 10-28 to 1-20."  It is apparent from the form that the nurse recorded what Simmons told her with regard to his previous

interventions, such as ice, splint, wound care, or medication, were performed on Simmons. Additionally, Simmons also admits in his deposition that he had a "busted lip." (Simmons Dep. at 198.)

Second, with regard to Simmons' claims that Timek and Miller hit Simmons at the hospital while on the stretcher, Simmons has not provided any evidence to support that claim, and the medical records also contradict this claim.

Third, with regard to Simmons' claims that he was sprayed with pepper spray for no reason, Simmons' conduct up until this point, as well as corroboration by Miller, also contradict his claims. It is not unreasonable to believe that someone who had been resisting arrest and acting violently from the moment of apprehension through an emergency room visit would continue to resist during transport to jail. This is also a reasonable assumption considering that despite pleading guilty to the robbery, in numerous submissions to the Court during the course of this lawsuit, Simmons has denied that he robbed the elderly blind man.

Additionally, an internal affairs investigation of a complaint lodged by Simmons for this incident exonerated Timek and Miller of wrongdoing, and Timek was aware that just a few months prior, Simmons has resisted arrest, and had pleaded guilty

---

medical history.

to that charge.

Thus, the evidence supports that the only force used by Timek in effecting Simmons' arrest was bringing him to the ground in order to handcuff Simmons, and spraying him with pepper spray while on route to the county facility.  None of the record evidence shows that Miller used any force.  Consquently, it must be determined whether bringing a suspect to the ground in order to effect the arrest of someone who is resisting arrest is excessive force, and it must also be determined whether the use of pepper spray to subdue an arrestee who is kicking the windows and doors of a patrol car is excessive force.

Based on the totality of the circumstances in this case, neither use of force was excessive.  First, as discussed above with regard to the October 28, 2003 arrest, bringing a robbery suspect to the ground who is resisting arrest in order to effect his arrest is not excessive force.  Second, the use of pepper spray to subdue an arrestee who had been arrested for a violent crime and who had been continually resisting arrest and acting violently was not unreasonable under the circumstances.  See Davis v. Township of Paulsboro, 421 F. Supp. 2d 835, 855 (D.N.J. 2006) (holding that an officer spraying the plaintiff once was reasonable under the circumstances because the plaintiff posed an immediate threat to the officer and possibly others in the house); see also Davis v. Township of Paulsboro, 421 F. Supp. 2d 835, 855 (D.N.J. 2006) (holding that spraying the plaintiff once

with pepper spray was objectively reasonable because the
plaintiff posed an immediate threat to the officer and possibly
others in the house, and because the plaintiff did not allege,
and there are no facts in the record, establishing that the
plaintiff suffered any lasting injury from the spray); Tofano v.
Reidel, 61 F. Supp. 2d 289, 301 (D.N.J. 1999) (officers' attempts
to subdue arrestee with pepper spray were reasonable when
arrestee was actively resisting arrest); Mitchell v. Yeadon
Borough, No. 01-1203, 2002 WL 265021 at *4 (E.D. Pa. Feb. 22,
2002) (use of pepper spray was reasonable when arrestee was
"yelling and screaming and cursing" and snatched his arm away
from the arresting officer); Modugno v. Pa. State Police, No. 00-
3312, 2001 WL 1382279 at *4 (E.D. Pa. Nov. 6, 2001) (use of mace
was reasonable when arrestee was "sprayed only after he
repeatedly refused to comply with [the officer's] verbal and
physical attempts to get him to cooperate").

       During transport to the county facility, Timek reported to
dispatch that he was pulling over because Simmons was kicking the
windows of the police car.  Miller, who was following behind,
also witnessed Simmons' behavior.  If Simmons had knocked out the
window, it would have provided Simmons with an avenue for escape,
which would have endangered the public and Simmons himself.  When
Timek opened the door, he again told Simmons to stop kicking the
window, and then Simmons attempted to kick Timek.  The use of the
pepper spray did cause Simmons to stop kicking at the car window,

and when he arrived at the facility, he was able to immediately wash his face.  Simmons does not report any injuries from the pepper spray.  Consequently, Timek's use of pepper spray to subdue Simmons was objectively reasonable and does not constitute excessive force.

In a claim for excessive force, "the central question is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).  Here, for both the October 28, 2003 arrest and the January 21, 2004 arrest, the undisputed evidence[8] shows that the force used by Timek was objectively reasonable under the circumstances, and was applied in a good-faith effort to restore discipline.

### b. Failure to train and failure to enforce a policy claims

In addition to his claims against the officers, Simmons has

---

[8]The Court again notes that in order to survive a motion for summary judgment, Simmons is required to demonstrate, through specific facts and affirmative evidence, a genuine issue of material fact such that a reasonable jury could return a verdict in his favor.  In order to succeed on his own motion for summary judgment, Simmons is required to demonstrate, through competent evidence, that there is no genuine issue as to any material fact, and that he is entitled to a judgment as a matter of law.  Even though Simmons' version of the events differs from the defendants' version, and the Court cannot make any credibility determinations with regard to either version, Simmons has failed to provide evidence sufficient enough to (a) demonstrate that he is entitled to judgment as a matter of law as to his version of events, or (b) that a reasonable jury could return a verdict in his favor based on his version of events.

also filed claims against the City of Atlantic City and the city's mayor at the time of the two incidents, Lorenzo Langford. Simmons claims that they failed to properly train the officers not to use excessive force, and that they failed to enforce a policy against excessive force.

Liability under § 1983 may be imposed on municipalities where acts of the government employee are deemed to be the result of a policy or custom of the municipality for whom the employee works.  See Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978); Natale v. Camden County Correctional Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).  In cases where the plaintiff alleges that the municipality failed to properly train the employee, the municipality can be liable under § 1983 if the failure to train constitutes "deliberate indifference" to the rights of persons with whom the police come into contact; mere negligence to adequately train is not enough.  Malignaggi v. County of Gloucester, 855 F. Supp 74, 7 7(D.N.J. 1994). Generally, "where a plaintiff seeks to establish liability based on a supervisor's (or municipality's) failure to train or supervise adequately, the plaintiff must show that a need for more or different training or supervision is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train or supervise can fairly be said to represent official policy."  Calhoun v. Vicari, No. 05-4167, 2005 WL 2372870, at *3 (D.N.J. Sept. 26, 2005)(relying on City of Canton

27

v. Harris, 489 U.S. 378, 388-92 (1989)).

In order to bring a claim of failure to train, a plaintiff must: "(1) identify the deficiency; (2) prove that the deficiency caused the alleged constitutional violation; and (3) prove that the failure to remedy the deficiency reflected deliberate indifference on the part of the municipality." Malignaggi, 855 F. at 77 (citing Canton, 489 U.S. at 391; Colburn v. Upper Darby Township, 946 F.2d 1017 (3d Cir. 1991)).

Here, the only policy of the City that Simmons identifies is a policy against excessive force.  He claims that Timek and Miller were not properly trained in this policy.  Simmons, however, has not demonstrated how the City and the Mayor have failed to train the officers on this policy.  Furthermore, the policy itself cannot be held to be unconstitutional. Consequently, the City of Atlantic City and the Mayor are entitled to summary judgment on Simmons' constitutional claims against them.

### 3.   Outstanding discovery motions

When the parties filed their summary judgment motions, six discovery motions filed by Simmons were outstanding.  Each will be addressed in turn.

**Docket No. 72 - Request "to enter into evidence video footage of the crime scene distance wise to Hermans Bar."**

Simmons requests this video footage to discount Timek's police report, which states that Timek saw Simmons running from

28

the crime scene into the bar.  It is unclear whether such video footage exists, but even if it did, Simmons seeks to use it for a purpose that is not relevant to his excessive force claims, which are the only claims pending against Officer Timek.

**Docket No. 75 - Request for a ten day extension to provide defense counsel with copies of all documents in Simmons' possession.**

Simmons made this request on August 28, 2007.  This request is now moot.

**Docket No. 78 - "Dispositive motion to enter expert witness."**

Simmons requests the Court to allow three expert witnesses to testify on his behalf with regard to his damages. Specifically, Simmons wishes to allow a licensed psychologist and two psychiatrists to testify to his mental damages as a result of the defendants' conduct.

On several occasions through out this litigation, Simmons has moved to enter other expert witnesses.  Each request has been denied.  (See, e.g., Docket Nos. 47, 58.)  For the reasons expressed in the Court's previous Orders, this request is denied as well.

**Docket No. 80 - "Motion to proceed with production of files."**

Simmons opposes the City of Atlantic City's request for Simmons to bear the cost of the reproduction of the defendant

officers' internal affairs records.  Because the City of Atlantic City has duplicated and provided to the Court those records, Simmons' motion is moot.

**Docket No. 81 - "Motion for sanctions and order to compel."**

In this motion, Simmons seeks an order compelling the defendants to produce their interrogatories and pretrial memorandum, and requests sanctions for their failure to do so. He also seeks that "any defense on the pretrial memorandum be barred at trial for manipulation and for failure to comply with Federal Rules of Civil Procedure."

This request must be denied.  First, it is unclear to which defendants this request applies, and it is unclear whether Simmons is seeking answers to his interrogatories or demanding that interrogatories be served onto him.  Second, because dispositive motions had been filed, the defendants were not obligated to prepare a pre-trial memorandum.  Additionally, upon certification of defendants' counsel, there are no outstanding discovery requests by Simmons for the defendants to respond to.

**Docket No. 82 - "Motion to deny request to barr plaintiffs evidence."**

Simmons requests that the defendants bear the costs of copying his discovery because it is too expensive for him.  He also complains that he has attempted to contact the defendants for a mutually-agreeable time for the defendants to review the documents, but the defendants would not cooperate.

30

As a primary matter, it is not a defendant's burden to pay for copying of the plaintiff's own evidence.  Additionally, the defendants have provided a certification of counsel denying that Simmons contacted them to arrange a review of his evidence.  Regardless of these issues, however, Simmons' request is now moot because he has provided his evidence to the Court, and, consequently, to the defendants via the electronic filing system.  Thus, this motion must be denied as well.

III. **<u>CONCLUSION</u>**

For the reasons expressed above, on Simmons' excessive force and failure to train claims, the defendants' motions for summary judgment must be granted, and Simmons' motion for summary judgment must be denied.  Simmons' six discovery motions must be denied as well.  An appropriate Order will be entered.


Dated: December 19, 2007                    s/ Noel L. Hillman

At Camden, New Jersey                    NOEL L. HILLMAN, U.S.D.J.

31